WINSTON BROS. COMPANY and the Utah Construction Company; Roy L. Bair & Company and James Crick & Sons; J. A. Terteling & Sons, Inc.; and T. E. Connolly, Inc.,

v.

The UNITED STATES.
Congressional No. 6-52.

United States Court of Claims.
April 5, 1955.

Garfield O. Anderson, San Francisco, Cal., for plaintiffs. Sherman E. Burt, Washington, D. C., was on the briefs.

John B. Miller, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge. ·

This case has come to us pursuant to a Resolution of the Senate of the United States, approved June 27, 1952, Sen. Res. 343, Report 1872, 82nd Congress, 2d Sess. The Resolution states that there was pending in the Senate a bill, S. 3326, for the relief of certain construction firms, and this court was asked to proceed in accordance with sections 1492 and 2509 of title 28 of the United States Code and to report to the Senate in accordance with those statutory provisions.

The bill referred to in the Resolution proposed to pay to the plaintiffs certain sums as compensation for the increased costs incurred by them as a result of the disruption or delay in their construction work under contracts with the Bureau of Reclamation. The bill stated that the disruption or delay was caused by insufficiency of appropriated funds for payment of normal construction earnings.

Pursuant to the rules of this court, the plaintiffs filed a petition, the case was referred to a Commissioner of this court who held extensive hearings at places convenient to the parties. He made findings of fact, the parties took exception to certain of his findings, filed briefs and made oral arguments to the court.

Each of the four plaintiffs had a contract with the Government, which acted through the Bureau of Reclamation of the Department of the Interior. Each contract was for the construction of some facility intended to make the water impounded by the Grand Coulee Dam on the Columbia River in the State of Washington available for irrigation. The four plaintiffs, two of which were joint ventures, will be designated in this opinion as Winston, Bair-Crick, Terteling and Connolly. Winston was to construct two canals; Bair-Crick was to construct an earthen dam; Terteling was to construct an earthen dam and portions of a canal; and Connolly was to construct a tunnel and a "siphon". The period of performance of the contracts was 800 days as to two of them and 900 days as to the other two. All of them, therefore, contemplated work extending beyond the fiscal year in which the contracts were made, and into the fiscal years ending June 30, 1948, and June 30, 1949.

Each contract contained the following provision:

"*Specifications, par. 11.*

"*Failure of Congress to appropriate funds.* If the operations of this contract extend beyond the current fiscal year, it is understood that the contract is made contingent upon Congress making the necessary appropriation for expenditures thereunder after such current year has expired. In case such appropriation as may be necessary to carry out this contract is not made, the contractor hereby releases the Government from all liability due to the failure of Congress to make such appropriation."

The authority for the Bureau to make contracts which contemplated payments being made from funds not yet appropriated was contained in the following provision of 43 U.S.C.A. § 388:

"When appropriations have been made for the commencement or continuation of construction or operation and maintenance of any project, the Secretary may, in connection with such construction or operation ·

and maintenance, enter into contracts for miscellaneous services, for materials and supplies, as well as for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor."

There were many other contracts, in addition to those of the plaintiffs, for construction in connection with the Columbia Basin Project. There were additional power units to be installed in the dam for the generation of electricity, there were pumps for the pumping plant to lift the water, impounded by the Grand Coulee Dam over to the reservoir from which it could be carried by gravity to the some 400,000 acres of land which it was intended to irrigate. In making up its estimates in 1946 for the money which it would need to carry all these things forward in the fiscal year beginning on July 1, 1947, and ending on June 30, 1948, the Bureau of Reclamation arrived at a figure of $62,500,000. The Secretary of the Interior cut this figure back to $52,500,000. The Bureau of the Budget approved a figure of $27,500,000. The House of Representatives included less than half that amount in its bill; the Senate included a higher figure; the bill went to a Conference Committee which agreed on $17,500,000, and the bill containing that amount was enacted.

The Managers on the Part of the House of Representatives, in reporting the results of the Conference to the House, appended to the report of the Conference Committee the following statement:

"Realizing that repayment of construction cost is an essential part of the reclamation policy, and that a major portion of repayment of the cost of the Columbia Basin project must depend upon power revenues, the conferees are agreed that funds provided in the bill should be so allocated as to permit completion and installation of the six generators presently on order for this project at the earliest possible date."

This statement meant that there were ready cash customers for all the power that could be generated at the dam, and that the prompt installation of the additional generators, the manufacture and installation of which had been delayed by World War II, would be the quickest way to secure some additional income to offset the Government's vast expenditures on the Columbia Basin project. The irrigation facilities, on which the plaintiffs were working, would not, at best, have led to the receipt by the Government of any income until several years later.

The officials of the Bureau of Reclamation took the statement above quoted of the Managers on the Part of the House as law. While it was not in the Conference Report, it said that the conferees had agreed that that was the intention of the appropriation. There was, and is, no reason to doubt the truthfulness of the statement. In the circumstances it was the duty of the Bureau of Reclamation to respect the known intent of the responsible managers of the legislation.

The officials of the Bureau of Reclamation were faced, then, with the problem of how to use the appropriated funds which were not sufficient to permit the carrying on of the work contracted for, and at the same time pay for the maintenance of the Bureau's own organization, and for some materials not yet contracted for, but which were necessary, at that stage, for the orderly development of the project. Our finding 8 shows the allocation which the Bureau made. Even the expenditures directly related to, or incidental or necessary to the carrying out of the power programs, were cut back from $22,313,000 to $16,254,000. The balance of the money, including a carry-over of nearly $4,000,000 from the preceding appropriation, was allocated as available for the continuation of the irrigation features of the project. But of this amount, $1,071,000 had, when the Bureau's allocation was made on August 8, 1947, already been covered by the estimates for the irrigation work done in July. The money for irrigation for the

remaining eleven months of the 1948 fiscal year was only $4,015,000.

The irrigation contractors, including the four plaintiffs in this suit, would have required an estimated total of nearly $14,000,000 to have proceeded on full schedule for the remaining eleven months of the fiscal year. They would have required $7,393,000 to have continued on full schedule through January 1948. Consideration was given to that date because it was hoped that by February 1, Congress might have appropriated additional money for the project.

When the problem was considered in August, 1947, there were three ways in which the money allocated for irrigation might have been used. The contractors might have been authorized to proceed at regular speed, in which case the funds would have been exhausted in October. They might have been required to slow down to such a rate as would have distributed the reduced available funds over all the remaining months of the fiscal year. That would have tied up equipment and resulted in overhead expense disproportionate to accomplishments. The third possible method was to apportion the available funds for expenditure during the months ending with January 1948, thus permitting the contractors to maintain, to a considerable extent, their working organizations, and be ready to proceed at full schedule if Congress did, as it was hoped it would, appropriate the necessary funds by that time.

Mr. Banks, the District Manager of the Bureau, met with the irrigation contractors on August 12. He told them that if they could agree among themselves as to a proper apportionment of the funds under the third alternative the Bureau would adopt it. If that was done, the individual contractor would be permitted to use up his money on whatever features of his work he chose. The contractors protested the fact that the appropriation was insufficient. They disagreed among themselves as to the allocation among them of the available funds. At later meetings, on August 14 and 16, adjustments were made in the tentative alloca-

tions to the individual contractors, and the contractors reluctantly agreed to the allocation to each contractor of a specified amount of the reduced funds. They did not waive their objection to the fact that they were not to be permitted to proceed on their regular schedules. The final allocation to the irrigation contractors was $1,430,000 more than the $4,-015,000 which was thought to be available. The Bureau was able to make its payments under this increased schedule, from what source the record does not show. Perhaps there was a larger carryover from the preceding year than had been counted on; perhaps some of the contractors did not use up all of the funds allocated to them; perhaps the apparent deficit was made up out of the supplemental appropriation which became available in December, 1947, which was sooner than had been anticipated.

About September 1, 1947, Mr. Banks addressed to each of the irrigation contractors an "Order for Changes" which stated how much the contractor would be permitted to earn under the reduced schedule, and how many days his time for completion of his entire contract would be extended, because of the curtailment of funds. The proposed change orders were not accepted by any of the contractors. They protested that the extensions of time were insufficient, and that their rights to recover damages for delay in performance were not preserved. After discussion during the early part of September, extensions of time were fixed by the Bureau, in one case considerably greater than had been proposed in the September 1 letter. No further attempt seems to have been made to get the contractors to agree to formal change orders. On November 26, 1947, letters were written to the contractors extending their times for performance by the number of days which the Bureau had decided upon early in September, except in the one case noted above.

The plaintiffs, and presumably the other irrigation contractors, proceeded on the basis of their reduced allotment of funds. Congress reconvened during De-

cember, 1947, and by supplemental appropriations made sufficient funds available to permit resumption of full construction schedules on the irrigation contracts for the remainder of the fiscal year. On December 26, 1947, the Bureau by letter advised the contractors of that fact, but did not specify an amount which would be available to any particular contractor. On February 6, 1948, each contractor was advised of the amount available to it, an amount which would permit full scale operation for the balance of the year.

The plaintiffs assert that they did, in fact, curtail their operations because of the shortage of funds; that by reason of the curtailment their schedules were disrupted, their equipment was caused to stand idle, and their overhead expenses continued without their being able to obtain earnings proportionate to the overhead. They urge that the Bureau of Reclamation had no legal justification for curtailing their funds. They say that Congress' appropriation of $17,500,000, plus the carryover from the preceding year, was more than sufficient to keep the irrigation contracts going, if it had been used for that purpose, which, they say, it should have been. They base their argument that the appropriation, if insufficient for all the requirements of the Columbia Basin project, should have been used first for the irrigation features, upon earlier legislation and one judicial decision. They cite the title to the original Reclamation Act of 1902, 32 Stat. 388, which named only irrigation as the objective of the Act. They cite the 1906 Amendment of the Reclamation Act, 34 Stat. 116, 117, § 5, which first authorized the Secretary of the Interior, if the development of electric power was necessary for irrigation purposes, to lease any surplus power or power privilege, but said:

"*Provided,* That no lease shall be made of such surplus power or power privilege as will impair the efficiency of the irrigation project."

They cite Burley Irr. Dist. v. Ickes, 73 App.D.C. 23, 116 F.2d 529, which cited and enforced the statutory provision quoted from the 1906 Act. They quote Section 2 of the 1935 Act authorizing the construction of the Grand Coulee Dam, 49 Stat. 1028, 1039, which mentions the generation of electric energy only "as a means of financially aiding and assisting" the flood control, navigation and irrigation features of the project. They point to the Reclamation Project Act of 1939, 53 Stat. 1187, 1195, which said:

"No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes."

They show that the above language was incorporated by reference in the Columbia Basin Project Act of 1943, 57 Stat. 14, 16 U.S.C.A. § 835 et seq. They quote a statement of the House of Representatives Committee on the Interior Department Appropriation Bill of 1949, as follows:

"*Statement of policy.*—The committee desires to reemphasize its statement in former reports on the bill, that the reclaiming of arid lands by the construction of reclamation projects is and always has been the primary purpose of the reclamation laws. Development of hydroelectric power is incidental to irrigation and is made as a means of financially aiding and assisting such undertakings. This policy should not be departed from without specific legislation by the Congress."

The plaintiffs argue, from the premises above recited, that the officials of the Bureau of Reclamation were required by law to allot the limited funds which they were given to irrigation work rather than to power work. We do not agree. The specific intention of the Congress which made the 1948 appropriation, or at least of the conferees who finally agreed, for their respective bodies, to the appropriation, was officially made known to the Bureau by the statement

of the House Managers. If that intention was a departure from a previous long standing policy of Congress, it was no worse for that, as Congress of course had the power to change that policy at its will. Perhaps the statement of the House Committee on the 1949 bill was an expression of regret that there had been a lapse from the policy in the 1948 Act. We think that the Bureau was legally justified in giving the preference that it did to the power features of the project. We also think that Congress would not have intended that the Bureau should make cuts much deeper than it did make in its permanent staff and expenses in its Denver office and its regional office, or in its wage board payrolls for work on force account. Any further saving which would have been of substantial benefit to the irrigation contractors would seem to have required the substantial disruption of the Bureau's permanent organization and, as we have said, we think Congress would not have intended that.

Assuming, then, that the Bureau's allotment between power and irrigation was lawful, we reach the Government's defense that it was not a breach of contract for the Government to fail to make funds available to pay for work for which it had contracted. The Government bases this defense upon the provision of the contracts which we have quoted earlier in this opinion. That provision, Paragraph 11 of the Specifications, said that if the operations of the contract extended beyond the current fiscal year, the Government would not be liable for the consequences of the failure of Congress to appropriate funds to carry out the contract.

■ The plaintiffs urge that this provision is no defense. They point to the language "In case such appropriation as may be necessary to carry out this contract is not made  *  *  * ", and say that, taking each plaintiff's contract by itself, there was plenty of money appropriated to carry it out, even after giving the preference to the power features of the project. We think that this is a too literal reading of Paragraph 11. It would make the provision practically inapplicable except in cases where specific parts of appropriations were earmarked for particular contracts. We think the provision at least means that where the agency authorized to spend the appropriation allocates the funds on a rational and non-discriminatory basis and they prove insufficient, the Government is not liable for harm resulting from the shortage.

From what we have said it follows that in our opinion the contractual provision forecloses the plaintiffs from having any judically enforceable claim against the United States.

We have, however, considered the facts of the case with a view to informing the Senate as to the amount of the damage which, in our view, the several plaintiffs suffered because of the insufficiency of the appropriated funds.

## WINSTON-UTAH CLAIM.

■ The plaintiff Winston-Utah had two contracts, one for the "West Canal" and the other for the "East Low Canal". A detailed recital of the facts concerning this plaintiff's claim is given in findings 18 to 31. By the end of July 1947 the West Canal was ready for concrete lining and for the construction of the two appurtenant concrete siphons. All this work was planned to be completed in the fall of 1947. Work on one of the siphons was discontinued on September 4 at which time eleven sections of the siphon were completed. This work would have, but for the shortage of funds, continued until November 8, at which time the plaintiff would have closed down all concrete work, in any event. The plaintiff lost 2.2 months of time on that siphon. No concrete lining on the West Canal was done that fall. The specially made equipment for that work was not delivered until September and it could not have been assembled and ready for operation before September 22. The plaintiff lost 1.7 months on that work. In substantially the same circumstances the plaintiff lost time amounting to 1.8 months on the siphons for the East Low

Canal. The plaintiff did not curtail any of its operations until September 4, and it did not curtail excavation in the East Low Canal at any time, this excavation work being continued through the winter. Mathematically it works out, as shown in our findings, that the plaintiff's work was slowed down by 79.4% during the period September 4 to November 8. We have applied this percentage to the plaintiff's fixed charges. As to its equipment, made idle by the curtailment of funds, the plaintiff in filing its claim with the Bureau of Reclamation used a formula which we are not familiar with, and which seems to us to give inadequate compensation. We have applied our usual formula to this item, eliminating however items already covered in the schedule of fixed charges.

Because of the shut-down of concrete work in September 1947 the plaintiff in order to get that work started as soon as the weather was suitable in 1948, set up its concreting equipment in February and March 1948. There was a considerable loss of efficiency of labor on account of the season, and we have made an allowance for that. We have also made allowances for a part of the cost of additional equipment purchased in 1948 partly to make up for time lost during the curtailment, and for increased costs of cement and carpenters' wages in 1948 over 1947. Our computation gives us a total figure of damages suffered by Winston-Utah of $102,475.41.

## TERTELING CLAIM.

Terteling had two contracts, one for the construction of Long Lake Dam and one for the construction of a part of the Main Canal. When funds were curtailed, it elected to continue full scale operations on its Main Canal contract. It did so continue, and makes no claim on account of that contract. As to the Long Lake Dam work, our findings 34 to 44 show the facts as we have found them and they will not be repeated in this opinion. Before the curtailment of funds the plaintiff was substantially behind schedule on many items of its contract. To do the work practically and economically it had to be done in a fairly definite sequence and if some key items were behind schedule, other items could not be proceeded with. Also for several weeks after the curtailment of funds had occurred, the plaintiff worked more man-hours that it had done before the curtailment. However, after October 31, 1947, work was slowed down. The plaintiff claims that it would have done concreting work after that date if funds had been available to pay for the work. If such work had been done in the winter, the plaintiff would have been subjected to extra expense for heating the water and aggregate, protecting the concrete after it was poured, and for the general inefficiency of labor in winter weather.

We have concluded that the plaintiff Terteling was subjected to some delay and some extra expense because of the curtailment of funds, and have included the expense of moving some equipment, the loss resulting from idle equipment and some overhead expense, the total amounting to $24,666.41.

## CONNOLLY CLAIM.

The facts with regard to the Connolly claim are detailed in findings 45 to 57. Before the curtailment of funds occurred, the plaintiff was already far behind its schedule. It had made a revised schedule on July 8, 1947, which might possibly have permitted it to finish its work on time. To have maintained that schedule would have put the plaintiff to very large extra expense for placing concrete in winter, and for the inefficiency of labor in winter work. But for late completion the plaintiff would have been subject to liquidated damages of $500 per day, hence it might have been willing to undergo the extra expense of the winter work.

The principal item of Connolly work was the Bacon Tunnel. The original plan was to work from both the north and the south ends of the proposed tunnel simultaneously. It was planned to first make a small tunnel from each end and, when these two had met, draw back to

each end and start excavating to the full dimensions of the tunnel. Excavation of the small, or "pilot" tunnel was commenced from the south end in December 1946 and from the north end in April 1947. Theoretically, by working from both ends, the tunnel could be driven in half the time it would take if worked from only one end. But in fact, the work from the south end went badly. The terrain over which the excavated materials had to be moved was bad, the elevation was unfavorable, and the plaintiff's ventilating equipment for purifying the air in the pilot tunnel after blasting worked badly, causing loss of working time. When the plaintiff on August 18, 1947, immediately after the discussions about the curtailment of funds, closed down the operation from the south end of the tunnel, we think it did what it had wanted to do for some time and had only refrained from doing because of the danger of subjecting itself to heavy liquidated damages for late completion. The shortage of funds discussion had assured the plaintiff of a generous extension of time for completion and relieved it of the pressure to continue inefficient and expensive operation just to gain time.

Our conclusion with regard to the Connolly claim is that, taking into account the accompanying extension of time, this plaintiff was not harmed by the shortage of funds.

## BAIR-CRICK CLAIM.

■ The plaintiff Bair-Crick had a contract for the construction of the South Coulee Dam and appurtenant works. This dam was to form the south end of the balancing reservoir 30 miles long into which water was to be pumped from the Grand Coulee Dam, and from which reservoir water was to be taken for irrigation. The South Coulee Dam was 9,900 feet long made of earth and rock fill with a concrete core some 30 feet wide. The details with regard to this plaintiff's work are given in findings 59 to 67. In the fall of 1946 the plaintiff submitted a proposed construction pro-

gram. By July 1947 the work was several months behind schedule. In July an estimate of this plaintiff's anticipated earnings for the period July 1947 through June 1948 was prepared by the Bureau at the plaintiff's request, and was approved by the plaintiff as prepared. It showed estimated earnings for the months of August 1947 through January 1948, the months during which the curtailment of funds was in effect, of somewhat less than this plaintiff actually earned and was paid during those months. Since the July estimate was prepared before there was any thought of reduced funds or operations, it is apparent that the reduction of funds did not cause the plaintiff to curtail its operations during the pertinent period. If the plaintiff did curtail its operations thereafter, it was because it obtained, in connection with the funds negotiation, an extension of time for completion which removed the danger of its being charged with liquidated damages for late completion.

■ Sparling Steel Company was a subcontractor with Connolly and Bair-Crick, furnishing steel to them for their contracts. It claims to have been damaged by their delay in accepting steel from it. Since we have found that neither Connolly or Bair-Crick was delayed by the reduction of funds, it follows that Sparling's derivative claim has no basis.

It has been urged on behalf of all the plaintiffs that the extensions of time granted them by the Bureau of Reclamation prove conclusively, or almost conclusively, that they were in fact delayed in their performance for the periods named in the extensions of time. It will be remembered that Mr. Banks of the Bureau first fixed upon the periods of extension before September 1, 1947, and notified the plaintiffs by letters of that date. Because the plaintiffs refused to accept the change orders embodied in those letters, there were no further letters about extensions of time until November 26, 1947, when Mr. Banks again wrote the plaintiffs, unilaterally grant-

ing them the extensions of time which he had named on September 1 in the proposed change orders. The only exception to this was in the case of Connolly which had persuaded Mr. Banks to increase its extension from 146 days to 365 days. Estimates made when the curtailment of operations had just begun, on contracts which originally had 800 or 900 days to run, were of course largely guesswork. Banks and the Bureau were embarrassed at having, apparently for the first time, contracted for work which Congress would not support by appropriations. Due to lack of funds, all work on the pumping plant, which was the key structure of the irrigation project, was discontinued. There was, therefore, no longer any urgency for the completion of the canals, siphons and dams which could not be used until the pumping plant was in operation. The Bureau could be and was generous with time. If, with the additional time available, the contractors chose to rearrange their work for greater efficiency and economy, that was to their advantage, and was not a harm resulting from the shortage of funds.

■ We treat extensions of time granted by contracting agencies on account of action or inaction by the Government as admissions against interest by the Government. That means that they are pieces of evidence in favor of the contractor, to be weighed along with the other evidence as to how much delay was actually caused by the Government's action or inaction. When, as in the instant case, the other and more direct evidence is convincing, the admission involved in the extension of time is of little weight.

■ Our report to the Senate is as follows:

The plaintiffs have no legal claim against the Government, they having released the Government from any such claim by Section 11 of the Specifications of their contracts. For the same reason they have no equitable claim in the sense of a claim enforceable in a court of equity. Two of the plaintiffs, Winston-Utah and Terteling, suffered damages in the amounts of $102,475.41 and $24,666.41 respectively because they were obliged without fault on their part, on account of the insufficiency of the amounts appropriated by Congress, to curtail their operations under their contracts.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I seriously doubt the right of the Bureau of Reclamation to so allocate the funds appropriated as to prefer one class of contracts over another.

The House managers reported to the House that "the conferees were agreed" that the funds appropriated should be spent first for the completion and installation of the generators. This was reported to the House of Representatives and it may be said that by the adoption of the Conference Report that House gave its assent to such an allocation; but the Senate is not shown to have given such assent. This body did not have before it this statement of the House managers. It had before it only the Conference Report, and this was silent on the basis for the allocation of the funds.

It, of course, takes the concurrence of the two Houses of Congress to pass a bill. They concurred only on the basis of the Conference Report, which, as stated, was silent on allocation.

It, therefore, comes down to this: There were outstanding $37,359,000 construction and supply contracts and limited force account demands. To carry them on, $17,500,000 was appropriated. This appropriation, plus the unexpended balance carried over from the previous fiscal year, amounted to $21,617,000.

It seems to me the several contractors had a right to expect that this amount should be prorated among their several

contracts. Since this was not done, I think the defendant is legally liable for the consequent delay.

It would have been otherwise if Congress had directed allocation to the power contracts first, but this was not done.

I, therefore, cannot agree to the report of the majority.